IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RICHARD OWEN TAYLOR #816002 | § | |
| v. | § | CIVIL ACTION NO. 6:04cv380 |
| LESLIE WOODS, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Richard Taylor, an inmate of the Texas Department of Criminal Justice, Institutional Division proceeding *pro se*, filed this lawsuit under 42 U.S.C. 1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. §636(c).

In his complaint, Taylor raised seven separate issues. He says first that on October 10, 2002, he was moved to P-2 housing area, K wing, cell 211. He says that this area faces northwest and that the outer wall consists of over 2000 glass windows, approximately eight feet from the cells. Numerous windows were missing, including windows directly across from his cell. He filed grievances regarding the missing windows and was told that they would be replaced, but that it would be time consuming.

On November 21, Taylor says, he asked Captain Crozier to turn off the exhaust vents because they brought in cold air, and Crozier replied "quit breaking out the windows and it won't be cold in here."  On November 24, 2002, Sgt. Peterson broke out a window and removed some temporary coverings. The next day, Taylor asked Sgt. Randall to turn on the heaters, and Randall replied that the heat would only go out the windows.

Taylor says that between October 10, 2002, and December 3, 2002, he was exposed to freezing temperatures as well as wind and rain blowing into his cell, and was provided a sleeveless

jumper, socks, sheets, and a thin blanket, but no coat. He also could not use a towel while showering and had to return, wet, to his cell.

As a result of these conditions, Taylor says, he suffered loss of sleep, mental anguish, and emotional distress. He acknowledges that coats were issued to the inmates on January 27, 2004.[1]

Next, Taylor says, in August of 2003, he was moved to housing area P-1 D Wing, Cell 119, but on October 23, 2003, he was moved back to P-2, K Wing, Cell 216. There were numerous windows missing, including windows directly in front of his housing area. Taylor concedes that the windows were replaced on December 6, 2003, but says that between October 23 and December 6, he had to endure cold temperatures.

In January of 2004, he was moved from Cell 216 to Cell 316. When he arrived at this cell, there were numerous missing windows. Between February 8 and February 27, 2004, the weather was rainy and windy, with temperatures in the low 30's, and between April 11 and April 19, 2004, the weather was rainy and windy with temperatures in the low 30's.

In "Count 2," Taylor says that the Defendants had subordinates turn off the ventilation system when the temperature ranged from the 80's on up, and during the hottest part of the day. He stated that the sun shone directly into his cell from 5 p.m. until sunset, and that he is not permitted to obstruct it, so he suffered from headaches, exhaustion, mental anguish, and emotional distress as a result of the sun shining in his cell.

In "Count 3," Taylor says that since October 10, 2002, he has been required to shower without a towel and return to his cell soaking wet, even when the weather is cold. He is also exposed to hazardous conditions in that the floor is wet from other inmates walking on it. He has written letters and grievances, but has been told that there is a shortage of towels.

In "Count 4," Taylor says that the showers do not have a thermostat, nor an emergency shut-off valve to cut off the water if the temperature gets too hot. Inside the shower, he

---

[1]The chronology of Taylor's complaint indicates that he may have meant January 27, 2003, but this is not clear.

says, there is a single valve that simply turns the water on and off; the valves which control the hot and cold water are in a pipechase behind the shower.  Taylor says that the officers are supposed to adjust the temperature for the water, but their is no thermostat, so they have to guess.  As a result, the majority of showers are either all hot water or all cold water.

Furthermore, Taylor says, the shower plumbing has a problem with "back flow," so the temperatures fluctuate.  The water may be tolerable and then suddenly turn scalding.  He says that there is not a "shut-off valve" to protect inmates from being scalded; he says that he has been scalded on more than one occasion.

On February 19, 2003, Taylor said, he sent Geraldine Buck, the Safety and Risk Manager, a letter about this, and Buck responded with a letter saying that she would talk to Captain Walker about addressing how to adjust the temperature with the security staff.  On March 16, 2003, Taylor wrote to Warden Moore and Buck about the problems with the shower.  On March 24, Buck wrote to Taylor saying that a problem had been identified but that a corrective action plan would be based on the total cost of the project and whether it could be done by the maintenance department.  On August 18, Taylor again inquired into the issue, and on August 24, he filed grievances about it, which were denied.

In "Count 5," Taylor says that he is not being supplied with adequate cleaning materials, including a cleaning rag, scouring powder, and disinfectant.  He says that he cannot adequately clean his cell and toilet, even when he moves into a new cell.  Furthermore, Taylor says that the showers are only cleaned twice a year, and do not contain adequate drains, so inmates must either stand in stagnant water or try to "dispense the water by using their hands."  The housing areas also are not sprayed for insects, so the stagnant water provides a breeding ground for insects such as mosquitos.  He has filed grievances, which have been rejected.

In "Count 6," Taylor says that he has been prescribed a special diet which includes three additional snacks per day, because he suffers from hypoglycemia.  However, he seldom receives these snacks.  He says that he has filed grievances, and was told that the problem would be

resolved, but it has not been.  He concedes that after he spoke with Warden Sizemore on January 28, 2003, Officer Defoor required her staff to personally deliver a snack after each meal and to have a form signed and dated that the snack was received, but this did not last long; on February 19, 2004, Taylor filed another grievance complaining that this procedure was no longer being used and so he was no longer getting his snacks.  On March 12, 2004, Major Mooneyham signed an inter-office communication ordering the subordinate supervisors to ensure that Taylor received his snack, but Sgt. Coleman told Taylor that he could not guarantee that Taylor would get his snack.

In "Count 7," Taylor says that on October 13, 2003, his cell was shaken down and some personal pictures were removed. He complained to Officer Knous, who said that he would talk to Sgt. Turner, and that Knous would ensure that the trash was not removed.  The next day, Taylor complained to Turner about the loss of the photos, but Turner would not reveal the names of the officers who had searched his cell.  Turner said that Taylor should have kept his pictures in a photo album rather than an envelope.  However, Taylor says, Turner admitted to him that he had seen an envelope in front of Taylor's cell, which appeared to have newspaper clipping in it, and that TDCJ policy requires that property removed from an inmate's cell be put in the property room and documented.  He says that Turner also admitted that if policy had been followed, Taylor's photos would not have been destroyed.  Taylor identifies the lost pictures as being family pictures, two pictures of himself from Marine Corps boot camp, and some photos of Russian women which he had ordered in the mail.

An evidentiary hearing was conducted on June 14, 2005, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing, Taylor testified that "hundreds" of windows were broken out, and that the inmates tried to cover them but the coverings were removed. He said that no coats were given out and that there was a shortage of towels. Taylor testified that as a result, he was cold; he indicated that he also suffered from sinus problems, but did not specifically say that these were related to the cold.

Taylor next testified about the water temperature in the showers, but acknowledged that prison officials had tried to fix the problem. He said that the showers had not been cleaned in months, but that inmates were supposed to clean them. Taylor acknowledged that no harm came to him as a result.

Taylor stated that he is hypoglycemic and that he is supposed to get snacks, but he does not. When he is moved, Taylor said, the food service department is not notified. He said that he often does not get snacks because the officers "have other things to do." Taylor said that no harm has come to him as a result of not receiving snacks.

Finally, Taylor testified that he was told that his photos were thrown out accidentally, and that he thinks that this was true. He stated that he was able to get more pictures of his family, but that he wanted the monetary value of the pictures which were lost.

Taylor's Medical Records

Taylor's medical records show that on October 28, 2002, he complained that he was suffering from allergies. On January 16, 2003, he again complained of sinus problems, but there is no indication that these problems were weather-related rather than being associated with his allergies. On February 5, 2003, Taylor complained of allergies, stating that he would be interested in trying allergy shots.

On March 26, 2003, Taylor asked about his snacks, and the nurse recorded that the order for his snacks was current. On April 30, 2003, and May 20, 2003, Taylor again complained of allergies. On July 3, 2003, Taylor complained of upper respiratory problems, but the source of this problems was not clear. On August 19, Taylor again complained of allergies.

On September 9, 2003, Taylor complained that he was suffering from migraines, which caused blurred vision and throbbing, usually on one side. He said that he has been hypoglycemic since his incarceration and that he had not had too many problems, but since the prison cut back on desserts, he is finding that he has been getting low more often. Taylor said "I receive snacks three times a day which are a great help." The following day, he saw the physician's

assistant, Berger, who ordered medications, snacks three times a day for six months, and weekly blood sugar checks.

On September 19, 2003, Taylor complained of allergies. On October 9 and October 17, Taylor complained that he had been improperly placed on a special diet called Diet for Health rather than the special diet which he was supposed to be on. He was initially told that he was not on the Diet for Health list, but he saw the physician's assistant on October 20 and she gave an order to discontinue the Diet for Health and to place him on a regular diet with three snacks per day. She said at that time that Taylor had a sinus infection and gave him medication.

On November 3, 2003, Taylor complained of a migraine, saying that his allergies seem to trigger the migraine attacks. Berger gave him an allergy medication called Drixoral, which she renewed on December 10, 2003.

On January 13, 2004, Taylor complained of a migraine, and Berger ordered medication for him. On February 13, 2004, Taylor wrote a note to the medical department saying "I get a snack three times a day because I'm hypoglycemic. Please renew this for me. This has been a big help."

On March 15, 2004, Taylor wrote a note to the medical department describing a cold, earache, and sore throat which he had. This note made no mention of cold temperatures or any other possible cause for the discomfort. Dr. Orig examined Taylor in response to a sick call request and said that he was suffering from an upper respiratory infection, for which he gave medication. On March 24, Taylor wrote a note asking for more sinus medication, again making no mention of cold temperatures, and medication was ordered for him.

On May 13, 2004, Taylor again complained that he had a cold, and medication was ordered for him. On May 28, 2004, Taylor asked to see the physician because his allergy medications were not helping. He was seen by Dr. Orig, who diagnosed chronic rhinitis, and ordered Drixoral. On May 31, Taylor wrote to Dr. Orig to tell him that the Drixoral was helping his allergies.

However, on June 13, 2004, Taylor wrote to complain that he was having problems with the right sinus and with sneezing. He saw the doctor and received medication.

On July 12, 2004, Taylor wrote a sick call saying that he had experienced sinus problems for a long time and that he has pressure behind his right eye. He says that Drixoral helps some, although it does not last the full 12 hours, but "for the most part, I'm getting relief." He asked to see the doctor or for a renewal of the Drixoral, and a renewal was ordered for him. Taylor's lawsuit was signed on July 30, 2004.

Legal Standards and Analysis

I. Exposure to the Weather

Taylor's first claim concerns exposure to cold temperatures. Under some circumstances, this could state a constitutional claim. In <u>Withrow v. Heaton, et al.</u>, slip op. no. 01-40350, the Fifth Circuit held that a plaintiff's claim that he was exposed to cold temperatures at the Coffield Unit was not frivolous. The Court determined that Withrow had adequately set out an allegation of harm by showing that the exposure to the cold had exacerbated his arthritis.

In the present case, however, Taylor offers nothing to show that he suffered any harm at all from the exposure to the cold. His medical records show that he suffered from allergies and migraines, which were both year-round conditions. None of Taylor's sick call requests ever mentioned cold weather. He suffered from sinus infections on a couple of occasions, but there is no indication that these resulted from the cold weather rather than from Taylor's chronic allergies. Taylor never complained to medical personnel about cold weather or that any condition from which he suffered was caused or exacerbated by exposure to the weather.

Instead, Taylor complains that the cold caused him discomfort and mental anguish. However, the law now provides that *in forma pauperis* claims by prisoners for mental anguish cannot be brought without a prior showing of physical injury. 42 U.S.C. §1997e(e). To the extent that Taylor complains of mental anguish and emotional distress, his claim fails because he did not show that he suffered any injury at all as a result of the cold. The Fifth Circuit has held that the Eighth

Amendment does not afford protection against mere discomfort or inconvenience. Wilson v. Lynaugh, 878 F.2d 846, 849 (5th Cir.), *cert. denied*, 493 U.S. 969 (1989). Taylor's claim on this point is without merit. *See also* McCord v. Maggio, 927 F.2d 844 (5th Cir. 1991) (plaintiff alleged that he lived in roach-infested, windowless, unlighted cells into which rain water and backed-up sewage leaked; the Fifth Circuit noted that McCord would have to show an injury from these conditions on remand in order to prevail); Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir. 1998) (emphasizing that the plaintiff "never alleged a physical injury).

In Woods v. Edwards, 51 F.3d 577 (5th Cir. 1995), the plaintiff complained of the high temperature in his cell, alleging that his sinus condition was aggravated by the heat. The Fifth Circuit noted that the plaintiff "failed to present medical evidence of any significance" and that "while the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment." Woods, 51 F.3d at 581. The same situation exists in this case. Taylor's claim on this point is without merit.

II. The Ventilation System

Taylor complains that the ventilation system was sometimes turned off, particularly during periods of heat. As a general rule, complaints about inadequacy of the ventilation system, without more, does not establish a constitutional violation. Parker v. Smith, slip op. no. 93-5542 (5th Cir., May 6, 1994) (unpublished), *citing* Rhodes v. Chapman, 452 U.S. 337, 347-48 (1981); *see also* Johnson v. Thaler, et al., slip op. no. 99-20222 (5th Cir., November 12, 1999) (unpublished) (allegations of inadequate ventilation and excessive heat did not state a constitutional claim).

As with the cold, Taylor's medical records contain no indication that he ever complained to medical personnel that he was suffering adverse consequences from the heat. His allergies and headaches, as noted above, were year-round conditions, and there is no showing that these were related to or exacerbated by heat or lack of ventilation. Taylor's complaint essentially

complains of lack of comfort, with no physical effects, and as such fails to rise to the level of a constitutional violation. Woods, 51 F.3d at 581.

### III. Showering

This is another complaint about the cold. Taylor says that since October 10, 2002, he has been required to shower without a towel and return to his cell soaking wet, even when the weather is cold, and that he is also exposed to hazardous conditions in that the floor is wet from other inmates walking on it. In a Step One grievance dated March 16, 2003, which was not appealed to Step Two, Taylor complains that of the lack of towels and says that during the past few months, he has been denied numerous showers because he would not shower without a towel, a situation which he blames entirely on Captain Reed. Taylor says that he refuses to sit in his cell soaking wet because there are no towels, indicating that he refuses to shower rather than go without a towel. The response is that due to an industry backlog, the unit has a shortage of towels, and that the laundry would do its best to supply towels considering the shortage.

As above, Taylor neither alleges nor shows any physical injury related to or exacerbated by the conditions of which he speaks. He did not complain to medical personnel that he was being exposed to cold temperatures after showering, and his medical records contain no indication that he suffered any effects therefrom. Taylor's grievance indicates that rather than showering without a towel, he instead declined to shower.

The fact that Taylor did not get all of the showers that he wanted, because of a shortage of towels, does not rise to the level of a constitutional violation. *See* Davenport v. DeRobertis, 844 F.2d 1310, 1316 (7th Cir.), *cert. denied* 488 U.S. 908 (1988) (allowing only one shower per week not a constitutional violation). Taylor has failed to show such a violation because he did not show any harm; in fact, as his grievance makes clear, he refused to subject himself to such conditions. Taylor's claim on this point is without merit.

IV. Water Temperature in the Shower

Taylor complained that the water temperatures were sometimes too hot or too cold, because of the construction of the pipes and the fact that the officers, who controlled the temperature, had to "guesstimate." He did not allege that anyone was trying to harm him or other prisoners intentionally, nor that the condition complained of was the result of deliberate indifference to his needs.

Neither does Taylor allege or show that he suffered any harm as a result of this condition. He says that he was "scalded" on more than one occasion, but nothing in the medical records indicates that any such injury required treatment, nor that Taylor ever complained about any scalding. It is not uncommon for showers in public places such as gymnasiums or hotels to experience fluctuations in water temperature. *See, e.g.*, Crawford v. Worth, 447 F.2d 738, 740 (5th Cir. 1971) (hotel guest suffered serious injury from burns when shower water temperature suddenly turned hot; hotel owner found not liable). In Locke v. Johnson, et al., slip op. no. 95-20678 (5th Cir., November 30, 1995), an inmate complained, *inter alia*, that the water temperature in the shower on certain occasions was too hot or too cold. The Fifth Circuit affirmed the dismissal of the lawsuit as frivolous. Taylor has failed to show a constitutional violation and his claim on this point is without merit.

V. Cleaning Supplies

In his fifth complaint, Taylor alleges first that he is denied adequate cleaning supplies. The responses to his grievances assert that cleaning supplies are passed out weekly, or "per policy," or "as requested," but Taylor's grievances themselves indicate that this is not being done.

Taylor conceded at the evidentiary hearing that he had not suffered any harm as a result of this condition. It should be noted in this regard that Taylor does not assert that the cells in which he is housed are filthy or deplorable, or that he experiences such conditions as human waste on the walls or floor. The Fifth Circuit has held that conditions-of-confinement claims contain both objective and subjective components, and for the objective component, "extreme deprivations" are

required to make out an Eighth Amendment claim. Davis, 157 F.3d at 1006. Taylor's pleadings and testimony wholly fail to show that he was confined under such extreme conditions as to violate the Eighth Amendment. *Compare* Gates v. Cook, 376 F.3d 323, 334 (5th Cir. 2004) (inmates held in cells "that were extremely filthy with chipped, peeling paint, dried fecal matter and food encrusted on the walls, ceilings, and bars, as well as water from flooded toilets and rain leaks"); McCord, 927 F.2d at 846 (inmate's cell had sewage water and human waste back up into it, and because there was no bunk, inmate had to sleep on mattress placed on the floor). In the absence of any harm to Taylor, or, alternatively, in the absence of any showing that the conditions of confinement amounted to an "extreme deprivation," regardless of whether any harm had yet been suffered, Taylor's claim on this point is without merit.

      VI. Deprivation of Snacks

In his sixth ground for relief, Taylor asserts that he is being denied medically-ordered snacks. He did not indicate that this was done deliberately to harm him; in fact, Taylor concedes that TDCJ-CID supervisors tried to ensure that he received his snacks, and even points to a memo from Major Mooneyham directing that Taylor's snacks be issued.

Rather, Taylor's pleadings make clear that the deprivation of snacks was the result of nothing more than negligence, carelessness, or inattentiveness by prison officials. The Fifth Circuit has stated, in an unpublished opinion, that a claim of denial of medically-necessary snacks showed at most negligence and did not rise to the level of a constitutional deprivation. Boyd v. Muhammed. et al., slip op. no. 99-40491 (5th Cir., March 30, 2000) (unpublished), *citing* Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).

A claim of negligence alone is insufficient to state a valid civil rights claim under 42 U.S.C. §1983. The Supreme Court has stated that the Due Process Clause of the Fourteenth Amendment is not implicated by a negligent act of an official causing unintended injury to life, liberty, or property. Daniels v. Williams, 474 U.S. 327, 331-33 (1986). Complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid

11

claim under the Civil Rights Act even if such complaints could be valid under state law. *See* <u>Bowie v. Procunier</u>, 808 F.2d 1142 (5th Cir. 1987). Because Taylor's claim amounts to nothing more than negligence, it does not set out a constitutional violation and is thus without merit.

In addition, Taylor acknowledged at the <u>Spears</u> hearing that he did not suffer any injury as a result of not receiving snacks. A review of his medical records confirms this testimony; Taylor never complained that he was not receiving snacks or that he was suffering any adverse consequences therefrom.

On the contrary, on September 9, 2003, Taylor filed a sick call request saying that he received snacks three times a day, which were a "big help," and then on February 13, 2004, he wrote a note to the medical department saying "I get a snack three times a day because I'm hypoglycemic. Please renew this for me. This has been a big help." He never complained that he was not receiving snacks, and on these two occasions, he indicated that he was getting the snacks and that they did help him. While the Court does not doubt Taylor's assertion that there were times when he did not receive his snacks, he makes no showing that he suffered harm from this fact or that the deprivation of his snacks was the result of deliberate indifference rather than negligence or carelessness. Taylor's claim on this point is without merit.

### VII. Loss of Photographs

Finally, Taylor complains that a number of photographs which he had, including family photos as well as pictures of Russian women which he had ordered in the mail, were lost in a shakedown. He testified at the <u>Spears</u> hearing that he believed that the loss of these photos was accidental.

The doctrine of <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See* <u>Caine v. Hardy</u>, 943 F.2d 1406, 1412 (5th Cir. 1991). Three predeprivation conditions

must exist before the doctrine can be applied. These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized. Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process. Charbonnet v. Lee, 951 F.2d 638, 642 (5th Cir. 1992), *citing* Zinermon v. Burch, 494 U.S. 113 (1990); Myers v. Klevenhagen, 97 F.3d 91, 94-95 (5th Cir. 1996).

Hudson holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. Hudson, 468 U.S. at 533. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); *see also* Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Thus, the appropriate forum for the plaintiff's claim lies in state court or in the administrative procedures of TDCJ rather than federal court. Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987).

In this case, Taylor acknowledges that the loss of his property was accidental, and thus was random and unauthorized. As such, his claim is one of no more than negligence, and does not rise to the level of a constitutional deprivation. In addition, the state administrative and judicial systems provide an adequate post-deprivation remedy. Murphy v. Collins, 26 F.3d at 543-44. For this reason, the proper forum for Taylor's claim on this point is in state court, through a conversion action, or in the administrative procedures of the prison. Taylor has failed to show that this claim raises a federal constitutional issue and so his claim on this point is without merit.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon

which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke, 490 U.S. at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Taylor's claims lack any arguable basis in law and fail to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous, except that this dismissal is without prejudice to Taylor's right to seek recompense for the loss of his photographs in state court or through the administrative procedures of TDCJ-CID. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

**SIGNED** this **22** day of **June, 2005.**

_____
HARRY W. McKEE
UNITED STATES MAGISTRATE JUDGE